IN THE CIRCUIT COURT FOR THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO.   05005832

05cv61128 Cooke

JEWEL FINANCE NETHERLANDS B.V.;
MANBALIQ CORP; MANBALIQ, S.A.;
CHASE FORBES TRUST, LTD.; and FIRST
GLOBAL HOUSE CORP., S.A.

     Plaintiffs,

vs



ROYAL BANK OF CANADA; LEROY B.
MAJOR; BLOOMBERG, L.P.; JOSEPH M.
HELLER; CHRISTOPHER S. BOTOSAN;
DONALD W. SHILTON; HUDSON
MANAGEMENT, LTD; MOORE STEPHENS
INTERNATIONAL, LTD.; MOORE
STEPHENS LOVELACE, P.A.; MOORE
STEPHENS BUTLER & TAYLOR; B&T
CORPORATE MANAGERS, LTD.;
MICHAEL W. TAYLOR; JOHN RAYMOND
MACARI; CENTURY CAPITAL, S.A.;
FOXMOOR HOLDINGS, LTD, S.A.; JAMAR
ENTERPRISES, INC.; SUMMIT
ENTERPRISES, INC.; ROBERT L.
GORMAN; CHUCK CLARK; EURO-
SECURITIES & ASSETS, LTD.;
LAWRENCE E. SMITH, SR.; LAWRENCE
E. SMITH, JR.; UBALDO CAPOZZI;
ALLFINA KAPITALANLAGEN A.G.;
NORBERT KLEIN;, individually, jointly and
severally,

     Defendants,

_____/

## SECOND AMENDED COMPLAINT FOR FRAUD, CONSPIRACY TO DEFRAUD, AND GROSS NEGLIGENCE AND VIOLATIONS OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT

Plaintiffs, Jewel Finance Netherlands, B.V. ("Jewel"); Manbaliq Corporation ("Manbaliq"); Manbaliq, S.A. ("MSA"); Chase Forbes Trust, Ltd. ("Chase Forbes"); and First Global House Corp., S.A. ("First Global") sue Defendants, Royal Bank of Canada ("Royal Bank"); Leroy B. Major  (a/k/a Leroy L. Major) ("Major"); Bloomberg, L.P. ("Bloomberg"); Joseph M. Heller ("Heller"); Christopher Settino Botosan ("Botosan"); Donald W. Shilton ("Shilton"); Hudson Management, Ltd. ("Hudson Management"); Moore Stephens International, Ltd. ("Moore Stephens"); Moore Stephens Lovelace, P.A. ("MSL"); Moore Stephens Butler & Taylor ("MSB&T"); B&T Corporate Managers, Ltd. ("B&T"); Michael W. Taylor ("Taylor"); John Raymond Macari ("Macari"); Century Capital, S.A. ("Century"); Foxmoor Holdings, Ltd., S.A. ("Foxmoor"); Jamar Enterprises, Inc. ("Jamar"); Summit Enterprises, Inc. ("Summit"); Robert L. Gorman ("Gorman"); Chuck Clark ("Clark"); Euro-Securities & Assets, Ltd. ("Euro Securities"); Lawrence E. Smith, Sr. ("Smith Sr."); Lawrence E. Smith, Jr. ("Smith Jr."); Ubaldo Capozzi ("Capozzi"); Allfina Kapitalanlagen A.G. ("Allfina"); Norbert Klein ("Klein"), individually, jointly, and severally, and allege:

## Jurisdiction, Venue, Conditions Precedent

1.     This is an action for damages in excess of $75,000 by each Plaintiff as against each Defendant.

2.     Other Defendants may be located in various jurisdictions and venues, but Royal Bank itself has at least four offices in Broward County; Gorman works in Broward-Dade County; and Jewel's principal, Robert L. Greiner ("Greiner"), also resides in Broward County.  Nearly all of the events giving rise to this case occurred in South Florida; many originated in Broward.  Pursuant to §§47.011, 47.051, and 48.193 Fla Stat, and other status and rules, jurisdiction and venue are proper in Broward County.

3.     All conditions precedent to this action have been satisfied. Specifically, Plaintiffs have performed all obligations arising under their contracts with Century and B&T, except those specifically precluded by Century's and by B&T's own deliberate or negligent breaches of duty, or by the deliberate or negligent breaches by the other Defendants.

## Plaintiffs

4.     Jewel is a corporation organized and existing under the laws of the Netherlands, with its principal headquarters at St. Lambertuslaan, Maastricht,

Netherlands; its Florida principal, Greiner, resides at Lighthouse Point, Broward County, Florida 33064 and negotiated with Macari in South Florida.

5.      Manbaliq* is a corporation organized and existing under the laws of the State of Florida with its headquarters at 3250 Mary Street, Suite 103, Miami, Miami-Dade County, Florida 33133; it is the United States sister entity of MSA, and owns all the stock of MSA.

6.      MSA* is a corporation organized and existing under the laws of the Republic of Panama, with its headquarters at Avenida Balboa, Edificio BBBA, Torre Menor, Piso No. 5, Apartado 6753, Zona 5, Panama, Republic of Panama; it is the wholly owned subsidiary of Manbaliq.

7.      Chase Forbes* is a trust organized and existing under the laws of New Zealand; at all material times, its *de jure* principal headquarters have been at 222 Second Avenue, Linden, Alberta, Canada, but its *de facto* headquarters have been in Broward County, Florida, where its chief executive officer, Murray H. Stark, has been temporarily residing during 2004 and 2005 while negotiating the transaction with Jewel, of which Chase Forbes is a beneficiary.

---

* Manbaliq, MSA, and Chase Forbes will sometimes be called collectively, the "Manbaliq Plaintiffs".

8.     First Global is a corporation organized and existing under the laws of the Republic of Panama, with its headquarters at Avenida Balboa, Edificio BBBA, Torre Menor, Piso No. 5, Apartado 6753, Zona 5, Panama, Republic of Panama.

## Defendants[1]

### (a) The "Royal Bank Defendants"

9.     Royal Bank is a banking institution organized and existing under the laws of Canada, doing business throughout the world, in the United States, in the State of Florida, in Broward County, Florida, and in Nassau, Bahamas.  Royal Bank is registered to do business in the State of Florida.  Its accounting work internationally is performed by Moore Stephens.

10.     Major is a citizen and resident of Nassau, Bahamas and at all material times was manager of Royal Bank's Nassau branch.

### (b) The "Bloomberg Defendants"

11.     Bloomberg is a limited partnership organized and existing under the laws of the State of Delaware, with its headquarters at 499 Park Avenue, New York, NY 10022; it is also registered to do business in the State of Florida.

12.     Heller is believed to be a citizen and resident of California, doing business for Bloomberg in Las Vegas, Nevada and in the State of Florida.

---

[1] The Defendants, or some of them, sometimes will be called, collectively, by the designation noted in the caption 8(a) through 8(e)

13.     Botosan is believed to be a citizen and resident of California, doing business for or with Bloomberg in Los Angeles, California and in the State of Florida.

14.     Shilton is believed to be a citizen and resident of British Columbia, Canada, doing business for or with Bloomberg, among other places, in the State of Florida.  He owns and/or operates Hudson Management.  He aided and abetted Macari and the other Defendants by the use of the false information in the Bloomberg screen described at paragraph 62 below.

15.     Hudson Management is an entity which appears to be organized and existing under the laws of the State of Texas, doing business for or with Bloomberg, among other places, in the State of Florida.  Through Shilton, Hudson Management permitted Macari to use the false information on the Bloomberg screen described at paragraph 62 below.

### (c) The "Moore Stephens Defendants"

16.     Although it attempts to avoid liability by calling itself a "network" or "an international association of independently owned accounting and consulting firms", Moore Stephens is an international public accounting firm organized and existing under the laws of the United Kingdom and elsewhere.

17.    Moore Stephens provides professional accounting and related managerial services throughout the world, and in the United States through its constituent parts, which it admits it calls "members".

18.    Moore Stephens includes among its "members": MSL in Orlando, Orange County, Florida, and in Miami Lakes, Miami-Dade County, Florida.

19.    Moore Stephens also includes among its "members" MSB&T in Nassau, Bahamas.

20.    Moore Stephens, through its various "members" provides accounting services in Florida for RBC, among others.

21.    Moore Stephens' web site, a copy of which is annexed and made a part of this pleading as Exhibit "A", says this about itself, among other things:

> "Moore Stephens International is regarded as one of the world's top 20 accounting and consulting networks with around 480 **representative offices** in 90 countries and 13,059 people. **We** share common values: integrity, personal service, quality, knowledge and a global view. This is **our commitment to our clients**, which ensures **we** provide added value services for them as well as a stimulating career for **our people**. **We** maintain a cohesive network to ensure modern and comprehensive services for clients worldwide, to meet standards of professionalism and value in each country.
> The first Moore Stephens **member firm** was established in London in 1907. Moore Stephens International network provides its **member firms**. These **member firms**, companies and correspondents are independent entities, owned and managed in each location. No partnership exists between them. However, **they actively strive to work together, sharing information, talent and know how**." (emphasis added)

Case 0:05-cv-61128-MGC   Document 77   Entered on FLSD Docket 09/29/2005   Page 8 of 75
*Jewel Finance vs Royal Bank of Canada, et al*
**Page 8 of 77**

22.     Another page on Moore Stephens' web site, copied and annexed as Exhibit "A¹" declares:

"To provide **our clients** with the services that help them meet their objectives, **we** need people of the highest caliber world wide.  **We** recognize the importance of **sound recruitment, training and career development** and it is **an integral part of our philosophy.**" [emphasis added]

23.     Moore Stephens' even uses a universal and consistent "member selection criteria" and claims to offer "comprehensive benefits" like a unitary organization, as stated on the webpage copied and annexed as Exhibit "A²", where it declares "Do you have what it takes to be a member of Moore Stephens International?... Moore Stephens International uses member selection criteria... if you meet these then we can offer you the range of benefits that only a comprehensive worldwide network can deliver."

24.     MSL is a professional association, a "member" of Moore Stephens, organized and existing under the laws of the State of Florida, and doing business through offices in Winter Park, Orlando, Orange County, Florida, and in Miami Lakes, Florida.  **It actually shares office space in Winter Park, Florida, with B&T (the subsidiary of MSB&T in Nassau).**

25.     MSL provides accounting for RBC, among others.

26.     MSL undertook to serve as escrow agent for the entirely fraudulent February 4, 2005 Century $2,841,900,000 USD "prospectus" which is annexed

and made part of this pleading as Exhibit "B", being specifically listed there as B&T's "correlate" to handle escrow moneys by Century's scam.[2]  As noted, B&T and MSL share office space in Winter Park, Florida

27.     MSB&T is a partnership of accountants licensed and operating under the laws of the Bahamas, doing business throughout the world as a member of Moore Stephens, with offices in Nassau, Bahamas and, through MSI and MSL in the State of Florida.

28.     MSB&T provides accounting for RBC in Nassau, among others.

29.     B&T is a limited company organized and existing under the laws of the Bahamas; it does business throughout the world, in the United States, and in the State of Florida, sharing office space with MSL at Winter Park, Florida.

28.     On the "prospectus" B&T is listed as MSL's "correlate" for Century's proposed swindle of investors.

29.     Taylor is a British subject and a permanent resident of the Bahamas; he is a partner of Moore Stephen's Bahamas member MSB&T and is managing director of B&T.  He performs accounting services for RBC in Nassau, among others.

---

[2] *See* "prospectus", p.5: "**Escrow agent…. Moore Stephens correlate B&T**…. located at Commerce Plaza, Suite 400, 1201 South Orlando Avenue, Winter Park, Orlando, Florida 32789-7192 USA" (emphasis added).  Merriam Webster's Collegiate Dictionary (11th Ed. 2004) at pg. 280 defines the noun "correlate" as "either of two things so related that one directly implies or is complementary to the other (as husband as wife)".  The OED (1989) Vol. III, pg. 963 defines "correlate" as "Each of two things so related that the one necessarily implies or is complementary to the other."

### (d) The "Macari Defendants"

30.     Macari is a citizen and resident of Palm Beach County, Florida.  He is president and chair of Century, Foxmoor, Jamar, and Summit.

31.     Century is a corporation organized and existing under the laws of the Bahamas; although it operates through Gorman's Broward County offices, its *de facto* headquarters are Macari's offices in Palm Beach County, Florida; it does business throughout the world, in the United States, in the State of Florida, and in Martin, Palm Beach, Broward, and Miami-Dade Counties, Florida.

32.     Gorman apparently resides in Palm Beach County, Florida; despite his constant use of the title "Esquire", he is *not* a member of the Florida Bar or any other bar association; he is a director of Century, and sometimes works out of a law office in Fort Lauderdale, Broward County, Florida, as a "paralegal" pretending to practice law without a license.  He may also be associated with Foxmoor, Jamar, and/or Summit.

33.     Clark (a/k/a Charles A. Clarke) is a citizen and resident of Palm Beach County, Florida; he is a CPA and is a member of an advisory board for Fidelity Federal Bank & Trust Company of West Palm Beach; he also holds himself out to be a director of Century.  He may also be associated with Foxmoor, Jamar, and/or Summit.

34.   Foxmoor is a corporation organized and exiting under the laws of the State of Florida; it is believed to be solely owned and controlled by Macari and *de facto* headquartered at Macari's Palm Beach County office.

35.   Jamar is a corporation organized and exiting under the laws of the State of Florida; it is believed to be solely owned and controlled by Macari and *de facto* headquartered at Macari's Palm Beach County office.

36.   Summit is a corporation organized and exiting under the laws of the State of Florida; it is believed to be solely owned and controlled by Macari and *de facto* headquartered at Macari's Palm Beach County office.

37.   Shilton is believed to be a citizen and resident of British Colombia, Canada.

38.   Hudson Management is an entity organized and existing under the laws of the State of Texas with its headquarters at 1210 W. Expressway 83, Suite 10, Pharr, Texas 78577-6504; it sometimes also operates out of the Turks and Caicos Islands.

### (e) Euro Securities Defendants

39.   Euro Securities is an entity organized and existing under the law of the United Kingdom, with its headquarters at Suite 25, 21-32 Edware Road, Marble Arch, London.

40.      Smith Sr. is a British subject working at the Euro Securities offices in Marble Arch, London.

41.      Smith Jr. is a British subject working at the Euro Securities offices in Marble Arch, London.

### (e) The "European Defendants"

42.      Capozzi is a citizen and resident of Italy; he is an attorney whose office is located at 00198 Roma – Via Salaria 4c, Rome, Italy.

43.      Allfina is a corporation organized and existing under the laws of the Federal Republic of Germany, with headquarters at both Basel, Switzerland, and Cologne (Köln) Germany, headquarters at Marieuburger Strasse 32 – 50968 – Köln, Germany, Switzerland, Italy, and throughout the world.

44.      Klein is a citizen and resident of Germany; he is Allfina's President, and his office address is at Allfina's headquarters is Cologne.

### Factual Background:

### (a) Jewel

45.      In Florida, in June, 2004 and thereafter, Macari and Century represented to Jewel's Florida principal, Greiner, that Century legally and beneficially owned certain large denominations of United States Treasury Bills

("T-bills") issued by the United States government.  Macari and Century later represented that B&T served as Century's trustee for the T-bills.

46.      Backed and endorsed by Royal Bank's written assurance, as detailed below, signed by Major, Royal Bank's branch manager, before a notary in the Bahamas, from June 2004 to the April filing of this case, Macari and Century continuously maintained and represented to Greiner and Jewel that Century, acting directly or through its trustee or assignee B&T (Moore Stephens' Nassau "member's" subsidiary), could accomplish full and effective assignment of the T-bills to Jewel.

47.      Particularly impressed by Royal Bank's written, notarized confirmation that the T-bills were physically-located "in" B&T's safe deposit box in Royal Bank's vault, and also impressed that Royal Bank's CPAs Moore Stephens' "member" was making similar representations, Jewel reasonably believed and accepted Macari's and Century's representations that they had full and unfettered right to deal with the T-bills.

48.      Jewel therefore entered upon the August 6, 2004 "Operating Agreement" with Century, which is annexed and made part of this pleading as Exhibit "C".

49.     By the Operating Agreement, Century and Jewel agreed to use Century's T-bills for private placement investments, sharing the profits equally between the two.  (A later amendment changed the profits split to sixty percent (60%) for Century, and forty percent (40%) for Jewel.)

50.     Among other things, the Operating Agreement required Century to execute or to cause the execution of several documents needed to conclude the placement of the investments.  Included among these was the documents entitled "Non-Circumvention, Non-Disclosure, and Confidentiality" Agreement (itself "Exhibit C" to the Operating Agreement) which is annexed and made part of this pleading as Exhibit "D" (the "Confidentiality Agreement").

51.     Among other things, the Confidentiality Agreement provides that:

(a) damages for violations will be the highest of (1) 110% of moneys received by the violator; (2) $100,000,000USD; or (3) Jewel's actual and consequential damages; and,

(b) violators who misuse another's confidential information contrary to strictures of Title 18 United States Code §§1831-1839, the Economic Espionage Act of 1996, [3] will be deemed to have violated that Act.

---

[3] That Act makes it a crime to misappropriate trade secrets by fraud or artifice, or to misappropriate confidential proprietary information.  The Act also applies to conduct committed outside the United States.  Among others, Century, B&T, MSB&T, and MSI are "foreign" as defined by the Act.

52.     On March 3, 2005 Century, B&T, and Jewel executed an Extension Agreement which reset all the deadlines for performance under the various agreements until September 15, 2007.  The Extension Agreement is annexed and made part of this pleading as composite Exhibit "E".  The exhibits to the Extension Agreement included, among others: the August 12, 2004 Operating Agreement, the correlative Century Promissory Notes, the Security Agreements for Jewel, the Collateral Deeds of Assignments to Jewel, and the two (2) December 6, 2004 assignments of interest from B&T to Jewel.  Those documents are also made part of this pleading as part of composite Exhibit "F".

53.     Although Century and B&T and their agents Macari, Gorman, Clark, and Taylor continued to delay in complying with their obligations under the Exhibits, they did reinforce their representation to Jewel by arranging with Bloomberg to list Century's / B&T's T-bills on the Bloomberg security display.  Photocopies of those security displays for each T-bill are annexed and made part of the pleading as Exhibits "G" and "F".

54.     Those defendants also complied with their obligations to file Uniform Commercial Code financing statements in Washington DC.  *See* UCC-1 financing statements which are annexed and made part of this pleading as Exhibits "I" and "J".  (Falsely filing UCC documents constitutes a felony.)

55.     As shown by the annexed composite Exhibit "K", which is annexed and made part of this pleading, Bloomberg holds itself out to the general public, and specifically to those such as Jewel in the financial community, as the source of reliable, dependable financial data.  Bloomberg's own website claims:

> We provide instant access to real time and historical financial data – and the ability to act on it.  Our clients include the world's central banks, investment institutions, commercial banks, government offices and agencies, corporations and news organizations. [Exhibit K, page 1 from Bloomberg's website]

> The Bloomberg Professional ® service is the serious choice for the financial professional.  Simply put, it is our core business: a revolutionary interactive financial information network that has become an integral way of understanding global financial markets.  *** …enabling access to more than 3.6 million financial instruments. [Exhibit L, page 3 "Bloomberg Professional"]

59.     As shown by Exhibits "I" and "J", Bloomberg displayed on its financial screen, and thereby represented to the financial community, including Jewel, that by virtue of collateral deeds of assignment and promissory notes, Jewel was the legal and beneficial owner of the two T-bills assigned to Jewel by Century/B&T.

60.     By accepting Century's assertion that it owned the putative instruments and by displaying them on its screen, Bloomberg therefore also

represented to Jewel that its own due diligence requirements had been satisfied and that Bloomberg was holding the displayed transactions out as valid and binding.

61.     The submissions in the Macari / Manter prosecution also show that Heller, Botosan, Shilton, and Hudson Management, or some of them, while employed by Bloomberg, have been previously engaged in swindles using inaccurate Bloomberg security screens.   In 1997, Heller was convicted in a criminal case I the Western District of Missouri (Springfield) in *USA v. Global Concepts A Tr* (money laundering by postal and interstate wire, and criminal forfeiture).   In 1998, he was also involved in *USA v. Stahlhut, et al* in the Western District of Missouri (money laundering, frauds and swindles, fraud by wire, scheme to defraud: money and tax stamps, and criminal forfeiture).

62.     A particular Bloomberg screen used to defraud Jewel.  *See* Exhibits "G" and "H".  The Shilton/Hudson Management version of the *same account* is annexed and made part of this pleading as Exhibit "M".  Comparison of the two screens reveals that Bloomberg apparently provides no protection whatever against blatant misuse of its screens: Exhibits "G" and "H" are quite plainly the same screen/ account number as Exhibit "M", with certain words wholly or partly changed.  For example, both are "I.D. #UT912" but that one is "UT912BX6" and

the other is "UB9127W81" but both are "firm #71398 / user #231339" and the other is "firm #71398/ user # ******". One uses "Tilton", another uses "Shilton".

63.     Viewed most favorable, therefore, Bloomberg was grossly negligent in hiring and supervising its associates, and grossly negligent in failing to monitor and to prevent repeated misuse of Bloomberg security screens for the perpetration of a series of scams, frauds, and swindles over many years by Heller, Botosan, Shilton, and Hudson Management.

64.     Alternatively, through its agents Heller and Botosan, Bloomberg, was consciously, deliberatively, and actively aiding and abetting a scam or series of scams, frauds and swindles over the years by the other Bloomberg Defendants and by the Macari Defendants

65.     The stated misuse of Bloomberg screens was unknown (and, by the exercise of ordinary care, unknowable) by Plaintiffs.  By April, 2005 all that appeared to be necessary for Jewel to complete Century's / B&T's obligations for Jewel to use the T-bills in the private placement activities, was for Royal Bank (or, if Defendants misrepresented that Royal Bank is the supposed bank with book entries, whichever bank has book-entry-system computer ledgers which could show or negate Century/B&T's ownership of and clear title to the T-bills) to confirm that B&T's December 6, 2004 assignments to Jewel were valid.  That

would have eliminated any doubt Jewel possessed full right, title, and interest in the T-bills, free and clear of all encumbrances.

66.     The language of the exhibits accord Century no contractual right whatever to have Jewel "prove" to Century that Jewel has the ability to perform before Century is required to comply with its own obligations.

67.     But on April 4, 2005 Macari telephoned from Florida to Jewel in the Netherlands and demanded, as an asserted condition to Century's / B&T final performance, that Jewel identify the banking partner with and through whom Jewel would deal with the T-bills.

68.     In furtherance of its own undertakings, Jewel had arranged in late 2004 to handle private placement of Century's T-bills through the IBI Bank, a Swiss banking institution.

69.     Groundlessly asserting the right to communicate directly with IBI Bank as condition to Century's performance, Macari had made a similar demand to identify the participating bank.

70.     Relying upon its contractual protection against Century's circumvention (*i.e.*, Century's covenant not to try to deal directly with Jewel's business contacts or to avoid or evade Century's obligation to pay Jewel its 40% of any profits), Jewel assented and identified IBI Bank to Macari.

71.     Despite, among other things, this presumed Economic Espionage Act violation, Macari promptly commenced to deal directly with IBI Bank, and Macari continues to do so.  Despite IBI Bank's agents Pasatti's and Koenig's direct knowledge that Century is obliged not to deal past or around Jewel, so do Pasatti, Koenig and IBI Bank.

72.     Jewel nevertheless made alternative banking arrangements to proceed with the investments.

73.     Upon learning that Jewel had made replacement banking arrangements, Macari demanded to be put directly in touch with Jewel's new bank.

74.     This time, Jewel declined to provide Macari direct access to its present banking associates.

75.     Acting for Century and asserting the Jewel refusal as a reason, Macari thereupon declined to cause Royal Bank (or any bank) to provide Jewel the computerized T-bill book-entry system information needed to commence its financial transactions.

76.     Jewel thereupon engaged the Miami law firm Bailey & Dawes LC ("B&D").  B&D reviewed the documents and saw the two B&T December 6, 2004 assignments to Jewel.  In both assignments, B&T represented and warranted that it had full legal and beneficial ownership of the T-bills.  Before a notary, Taylor had

solemnly and formally represented that B&T had the right to assign and had assigned both T-bills to Jewel.

77.     B&D therefore telephoned B&T's Taylor to demand compliance. Taylor admitted that he had executed the assignments to Jewel for B&T, admitted the assignments had been notarized, but asserted nonetheless that the assignments were "not correct". Taylor claimed that Macari was B&T's principal, and that B&T needed "instructions" from Macari. *See* B&D's April 5th, 2005 letter to Taylor, annexed and made part of this pleading as Exhibit "N".

78.     In Exhibit "N", B&D demanded compliance with the Defendants' contractual obligations, but neither complied.

79.     Taylor telephoned Macari to report B&D's telephone call. Macari then called B&D, made threats, and otherwise asserted the things annexed and made part of this pleading as Exhibit "O".

80.     In his April 5th, 2005 letter, *see* Exhibit "O", Macari attempted to conjure up a non-existent Jewel obligation to permit Macari to circumvent Jewel.

81.     B&D responded with the letter annexed and made part of this pleading as Exhibit "P" that the documents demonstratably accord Century no such right.

82.     Despite Macari's threats and rancor, both his letters purported to state Century's continued willingness to comply with its contractual obligation. In view of the information disclosed by Macari's guilty plea and court submission (*See* paragraph 87) that willingness was feigned.

83.     Macari continued his baseless demand for direct access to Jewel's bank as a condition to performing Century's contractual obligations. Macari, Century, and B&T never complied with their contractual obligations to Jewel, or to the other Plaintiffs.

84.     On April 21, 2005, continuing its investigation of the facts underlying this suit, B&D learned that on November 15, 2002, Macari surrendered to the United States after his indictment for mail fraud in violation of Title 18 United States Code §1341, *Frauds and Swindles*.[4]

85.     In that case, which remains active as of this filing, although most of the filings are sealed, the unsealed filings do reveal that on February 28, 2003, *Macari pled guilty* to the charge of use of the mails to commit "frauds and swindles". Thereafter, based on the then–applicable sentencing guidelines,

---

[4] *See United States of America v John R. Macari*, Case No.02-14084-CR-Paine (United States District Court, Southern District of Florida, West Palm Beach Division).

Macari's sentence was apparently enhanced (*i.e.,* increased) "because of more than

minimal planning or a scheme to defraud more than one victim".[5]

86.    Therefore, for as many as eight to ten years, *before* Defendants

engaged in their frauds and swindles against these Plaintiffs, their frontman,

Macari, has admitted that he was engaged in criminally defrauding and swindling

other investors such as Plaintiffs. **At least one of those prior swindles involved**

**used of Bloomberg security screens.**

87.    Indeed, in a joint submission by the United States Attorney's Office

and Macari as Exhibit A to the Macari's "Memorandum in Aid of Sentencing" in

*US v. Macari*, the prior activities were elaborated:

> The USAO and ... [Macari] stipulate to the following facts concerning the
> scheme and artifice devised and/or executed in the Southern District of
> Florida, and elsewhere, by ... [Macari] and others with the intent to defraud
> and to obtain money or property by means of false or fraudulent pretenses,
> representations, or promises:
>
> > In 1998 and 1999, ... Macari, George Manter, and other persons more
> > fully identified below, collaborated to defraud several individuals of
> > moneys and fees paid by those victims to Manter and Macari for
> > placement in a so-called high-yield investment program. As part of
> > the scheme, Manter and **Macari represented to investors that**
> > **Macari was the owner, or otherwise had exclusive control, of**
> > **United States Treasury Bills (T-bills) with a face value that varied**
> > **from $100 million to over $1 billion. According to the scheme,**
> > **Macari, in exchange for a fee paid by the investor, would execute**
> > **an assignment of T-bills to the investor,** which T-bills would serve

---

[5] *See* May 3, 2003 filing by Macari's counsel, annexed and made part of this pleading as Exhibit "Q".

as collateral to protect the principle invested by those wishing to participate in the high-yield investment program.

In another permutation of the scheme, Macari would agree that, for a fee, he would, in essence, "lease" T-bills to a person seeking a large commercial loan, but who lacked the requisite collateral for that loan. According to the scheme, and as represented by Macari, those T-bills would serve as collateral for a letter of credit that could then be used to obtain a loan from a bank.

As proof of Macari's ownership of these T-bills, Macari provided, inter alia, (1) an alleged assignment of the T-bills from Dr. John and Dr. Jeanmarie Juncal[6] to Century Capital (Macari's corporation); (2) an attestation by at least one attorney of the authenticity of the CUSIP numbers assigned to the T-bills and of the lack of public record as to any liens or encumbrances on those T-bills; and (3) safe keeping receipts (SKRs) from an Italian investment company reflecting the existence and authenticity of the T-bills in question.   In certain instances, he also told investors that Deutsche Bank would endorse the SKRs.

The Cusip numbers that were provided to the victims were, in fact, valid CUSIP numbers for existing Treasury Bills.  Moreover, Macari and Manter advised several persons that these CUSIP numbers could be **verified by checking with the Bloomberg web site on the Internet.** [7]

The evidence shows that the T-bills and CUSIP numbers that form the basis of the fraud in this case were referenced as collateral in various fraudulent transactions initiated in the mid 1990's by Dr. John and Dr. Jeanmarie Juncal.   In the late 1990's, the Juncals and defendant Macari were introduced to each other by Edward Price... the owner of Price Capital, Inc ... [PCC] of Atlanta, Georgia, and had become

---

[6] Juncal was also convicted of "frauds and swindles".  *See Juncal v. USA* 245 F3d 166(2d Cir 2001), copy annexed and made part of this pleading as Exhibit "R".

[7] Unlike the Bloomberg screens used by Macari with Plaintiffs, the Bloomberg information in *Manter* rather inexplicably was perceived not to show ownership of the T-bills.  The screens in the present case do purport to show ownership.

**Law Offices**
**BAILEY & DAWES, L.C.**
CONTINENTAL PLAZA, SUITE 100, 3250 MARY STREET, MIAMI, FLORIDA 33133 · TEL 305 374 5505 · FAX 305 374 6715

involved with the Juncals in the effort to market the use of T-bills that the Juncals allegedly owned or controlled as collateral for loans.

After his introduction to the Juncals, Macari claimed to various investors in this case that he had purchased T-bills from the Juncals with a total face value in the hundreds of millions of dollars. Initially, Macari would offer these T-bills, for a fee, for use by the investors as collateral to be leveraged in one manner or another for funding of commercial loans. **One method suggested by Macari was the pledging of the T-bills in exchange for a letter of credit ... , which ... could then be used to obtain funding from a bank. However, because there was no proof of Macari's ownership/control of the T-bills, and therefore none that could be used by the victims to leverage a loan as promoted by Macari, Macari's and Manter's "clients" were unable to obtain the loans that they sought.**

... [P]roof of ownership of a T-bill would be reflected in an account statement for the bank or financial institution account where that T-bill is being held. Such account statement would reflect the face amount of the T-bill, the date issued, the maturity date, the CUSIP number, and, of course, the identity of the owner(s) of the account. Macari could not show such an account statement, however, for the simple reason that he never owned or otherwise had control of these T-bills.

**To overcome that hurdle, Macari initially attempted to convince his investors of his ownership/control of the T-bills by providing the investors with "safe keeping receipts" (SKRs) purportedly issued by an escrow agent. These SKRs were not issued by any bank or other reputable and easily contacted business entity.** Rather, the primary purported "escrow agent" and issuer of SKRs that Macari used was Milton Brothers, Ltd. (MBL) of Rome, Italy ... well-known to law enforcement in Italy as being engaged in various fraudulent financial activities .... In November 1999, MBL filed an application with the Department of Treasury, Bureau of Public Debt (BOPD), in which MBL claimed to be the lawful owners of certain T-bills that it had received from JAMAR Enterprises (JAMAR), Macari's corporation.

**Law Offices**
**BAILEY & DAWES, L.C.**
CONTINENTAL PLAZA, SUITE 100, 3250 MARY STREET, MIAMI, FLORIDA 33133 · TEL 305 374 5505 · FAX 305 374 6715

Included with that application was documentation signed by … Macari averring ownership of those same T-bills by JAMAR and purporting to transfer them to MBL. Also included with that application was a sworn affidavit by an attorney, William E. Corley, of Stuart, Florida… that the T-bills that were the subject of MBL'S application had previously been owned by Red Rock Dragon[8] (RRD – a company owned by the Juncals), that RRD had assigned those T-bills to… PCC… and that PCC had assigned those T-bills to JAMAR. The BOPD rejected that application due to its awareness of allegedly fraudulent activities in which … Macari had previously engaged.

Those investors who attempted due diligence of Macari and the financing he proposed, quickly encountered the ownership/control hurdle. Like anyone with access to a computer, those persons, or their legal counsel, were able to confirm the existence of those T-bills and CUSIP numbers through the Bloomberg web page…[9] Most were … convinced of Macari's bona fides upon receipt of the SKR's.

In an effort to enhance the indicia of his ownership of the T-bills that were at the heart of his fraudulent scheme, Macari, in early 2000, opened a Treasury Direct account with the Treasury Department's BOPD in the name of Century…. He then attempted to transfer several T-bills into that account by preparing and executing a U.S. Treasury Form PDF5179 that purported to transfer the T-bills from the Juncals to Century…. [Macari] forged the signature of Dr. Jeanmarie Juncal on that form; however, even if Dr. Juncal had executed the form herself, such document could not have served as the basis for a transfer of the T-bills into Macari's account at BOPD inasmuch as the Juncals had no proof of ownership of those instruments.

… [T]he government's evidence … shows that the … scheme to defraud was executed through various methods of communication by Macari and Manter, between themselves, and with the victims. One such method of communication was the use … of the telephone lines,

---

[8] *RRD is Red Rock Dragon Securities Ltd. See Juncal v. USA 245 F3d 166 (2d Cir 2001)*
[9] *See note 6 above*

for voice and facsimile communications. In addition, on or about April 6, 2000, Macari mailed, or caused to be mailed, from Palm City, Florida, to the Federal Reserve Bank in Jacksonville, Florida, an application for a Treasury Direct Account in the name of Red Rock Dragons. Finally, in or about December 1999, …[Macari] caused to be mailed by a private interstate courier, from Rome, Italy to Washington, D.C., USA, an application for a Treasury Direct Account in the name of… [MLB].

In or about September 1999, … Macari and … Manter discussed a joint venture between JAMAR … and International Banque Holding Corp., Manter's corporation, to induce participation of various persons in a high yield investment program sponsored by Manter. **According to the plan … Macari would provide collateral in the form of T-bills for the investors' funds placed in a bank debenture trading program. According to Macari, the T-bills were being held by [MBL] which company had issued safe keeping receipt (SKRs) reflecting that … [MBL] was holding the T-bills.** … Macari also represented that, for $50,000, he arranged for [MBL] to obtain endorsements of those SKRs from Deutsche Bank. Macari never produced such documents, however. On September 7, 1999, Macari and Manter executed an agreement for the sharing the proceeds of the joint venture. That agreement specified, among other things, as follows:

(i)     that Manter had contacts who were "capable of performing high yield investments;"

(ii)    that Macari had United States Treasury Bond CUSIP Nos. 912810DW5(B), 912810DW5(E),912827X49(F), and 912827X49(G), each with a face value of $100,000,000 and "capable of collaterizing high yield investments;"

(iii)   that Macari would obtain "Safekeeping Receipts" and "Reserve T-bond letter from … [MBL], and a Deutsche Bank confirmation

As a result of the efforts of Manter and Macari, several victims wrote checks or otherwise transferred funds to Manter's account at Planter's

National Bank for placement in Macari's investment program. The total amount of those payments by the victims was $2,800,000. In turn, Manter transferred a portion of those funds to Macari, that is, $910,000, purportedly to obtain use of the T-bills as collateral for investor funds. **At no time did Macari provide T-bills or any other legitimate or verifiable collateral for those investors' funds.** Nor did Macari or Manter ever place any of these investors' funds into an investment program. None of these investors ever received any proceeds....

***... the net loss to the victims is $1,600,000.

As further evidence of ...Macari's criminal intent in the instant offense, the USAO would offer evidence ...that, as early as 1997, Macari offered another William Cornell the use of these same T-bills as collateral for a high yield investment program. Cornell had previously been seeking funding through a Norwegian businessman named Christian Mohr and, in correspondence from Mohr had noted the reference to Macari at a U.S. phone number. He called that number to inquire of Macari about Mohr and, when Macari learned that Cornell was seeking funding, suggested that Cornell deal directly with him rather than Mohr. Cornell ultimately chose to do that and agreed to pay Macari several hundred thousand dollars as a fee for the promised use of T-bills. Cornell thereafter paid Macari $90,000 of the amount due for that fee. When Cornell presented the assignment of T-bills that Macari provided to him as collateral for a loan, he was rejected by the various lending institutions with the explanation that proof of ownership of the T-bills, not merely existence thereof, was required. Although Cornell demanded that Macari return the fee paid to Macari, to date, Macari has refused to do so.

[¶11 of Exhibit A of Macari's submissions re: sentencing; footnotes and emphasis added]

### (b) Manbaliq and MSA (here collectively "Manbaliq")

88.     Macari and Taylor, for themselves, had this related entities, in conspiracy with or abetted by some of the other Defendants, perpetrated a similar scam, fraud, and swindle on Manbaliq.

89.     In June 2004, Macari and Century represented to Manbaliq that Century legally and beneficially owned certain large denomination T-bills. Macari and Century later represented that B&T served as Century's trustee for the T-bills.

90.     Backed and endorsed by Royal Bank's written assurance, signed before by Royal Bank's branch manager, Macari and Century continuously maintained and represented to Manbaliq that Century, directly or through its trustee or assignee, B&T, could make full and effective assignment of the T-bills to Manbaliq.

91.     On June 3, 2004 Manbaliq and Century entered into a "Joint Venture Agreement", Contract No. MSA/CCSA-U83, whereby Manbaliq and Century agreed to use Century's putative T-bills for an asset management program in which resulting profits would be divided fifty percent (50%) to Manbaliq and fifty percent (50%) to Century. A copy of that agreement is annexed and made part of this pleading as Exhibit "S".

92.     On June 10, 2001, Manbaliq and Century entered into a "Joint Venture Agreement", contract No. MSA/CCSA-W81, whereby Manbaliq and Century agreed to use Century's putative T-bills for an asset management program in which resulting profits would be divided fifty percent (50%) to Manbaliq, and (50%) to Century.  A copy of that agreement is annexed and made part of this pleading as Exhibit "T".

93.     On June 12, 2004, Manbaliq and Century also entered into a "Joint Venture Agreement", contract No. CFT/CC0604, re-stating the same agreement. A copy of that agreement is annexed and made part of this pleading as Exhibit "U" (although the title doesn't include Manbaliq, it is also executed by Manbaliq, which is a participant by separate understanding between Manbaliq and MSA).

94.     Also particularly impressed by Royal Bank's written June 1, 2004 representation and confirmation that Century's T-bills were in B&T's safe deposit box at RBC's vault, Manbaliq accepted Macari's and Century's representations that they had full and unfettered right to deal with the T-bills.

95.     The joint venture agreements were subject to non-circumvention and non-disclosure provisions and the parties irrevocably agreed not to circumvent, avoid, bypass, or obviate each other, directly or indirectly, in any transaction.

96.     On September 22, 2004, Manbaliq entered upon a fee sharing agreement with Jewel Finance and Chase Forbes whereby Manbaliq agreed to share its profits from the Century joint ventures thirty percent (30%) to be received by Manbaliq, thirty percent (30%) to be received by Chase, and forty percent (40%) to be received by Jewel.

97.     In early 2005, Century and B&T, through Macari, Gorman, Clark, and Taylor reinforced their principal representation to Manbaliq by arranging with Bloomberg to list Century's/B&T's assigned T-bills on the Bloomberg security display.  Copies of those security displays for each T-bill are annexed and made part of this pleading as Exhibits "G" and "H".

98.     Thereafter, the Euro-Securities parties apparently entered upon investments using Century's false claim to own the T-bills, and reportedly generated massive profits, which they failed to share with Plaintiffs.

### (c) First Global

99.     Following generally the same scheme and artifices to defraud set forth above, Macari, Century and the other Defendants also defrauded and swindled First Global.

100.     In late 2004 Century and Macari also represented to First Global that Century legally and beneficially owned certain large denomination T-bills. Macari and Century later represented that B&T served as Century's trustee for the T-bills.

101.     First Global entered into a binding agreement with Century to use Century's T-bills for private placement investment whereby sixty percent (60%) of any profits would go to Century and forty percent (40%) to First Global. A copy of that agreement is annexed and made part of the pleadings as Exhibit "V". The agreement contained provisions preventing any attempt to deal directly with the persons and entities First Global engaged.

102.     In the binding agreement between First Global and Century, Century – which never intended to approve any document - reserved the right to approve or disapprove of any transaction First Global signed.

103.     First Global had disclosed to Century/Macari that it was contacting an Italian lawyer, Capozzi, to obtain contacts for investment opportunities.

104.     Knowing that First Global was about to contact Capozzi, on November 5, 2004 Macari purported to send to Capozzi a "cease and desist" letter. The letter never reached First Global.  Capozzi knew that First Global knew nothing of a "cease and desist" letter; nevertheless, he proceeded misleadingly to negotiate with First Global.  Capozzi also misled First Global into the belief that

First Global would receive a substantial portion of any profits resulting from investment contacts Capozzi would arrange for Century's T-bills, when the document itself provided for no compensation to First Global.

105.    The contract written by Capozzi and Allfina potentially denied First Global its fees from the pursuit of any investment opportunities arising from Macari/Century.

106.    The contract devised by Capozzi included a profit-sharing arrangement with trader Allfina based upon private placement investing of Century's purported T-bills.    This contract included Capozzi, Allfina, and Macari/Century but potentially excluded First Global from all profits derived from the investment opportunity.

107.    Based on the misleading and unclear contract between First Global and Capozzi, Century, and Allfina secretly devised a new agreement, with the knowledge of Allfina's principal, to directly circumvent First Global with the cooperation and aid of Capozzi. This effectively removed First Global from its fee sharing arrangement with Century, misleading First Global into a false reliance on its negotiation and contract with Capozzi.

108.    Thereafter, Capozzi, Allfina, and Klein are believed thereafter to have entered upon investment using Century's false claim to own the T-bills,

successfully generating large profits, and misappropriated all proceeds for themselves.

## I – VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT; 1st Claim

109.    Plaintiffs reallege paragraphs 1 through 108.

110.    This is a civil action by Jewel under §772.101 (1) Fla. Stat. against the Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, and the Macari Defendants.

111.    In violation of §772.101(1) Fla. Stat., Defendants received income, directly and indirectly, from a pattern of racketeering activity which included frauds and swindles against the private placement investors through the false representation of possessing and making T-bills available for investment purposes.

112.    In violation of §772.101(1) Fla. Stat., the sources of Defendants' income included fee payments for the provision of the T-bills for the private placement investment operations.  These fee payments were paid to Defendants, but the T-bills were never provided to the private placement investors.

113.    In violation of §772.101(1) Fla. Stat., Defendants also developed additional income opportunities by circumventing confidentiality agreements with these investors and dealing directly with their contacts.

114.    In violation of §772.101(1) Fla. Stat., this income was then put back into Defendants' fraudulent investment operations which engage in interstate and foreign commerce.

115.    As a result of Defendants' misconduct, Jewel was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue which Defendants' contracts would have forseeably allow Jewel to earn.

## II – VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT; 2nd Claim

116.    Plaintiffs reallege paragraphs 1 through 108.

117.    This is a civil action by Manbaliq under §772.101(1) Fla. Stat. against the Royal Bank Defendants, the Moore Stephens Defendants; and the Macari Defendants, and the Euro-Securities Defendants.

118.    In violation of §772.101(1) Fla. Stat., Defendants received income, directly and indirectly, from a pattern of racketeering activity which included frauds and swindles against the private placement investors through the false representation of possessing and making T-bills available for investment purposes.

119.    In violation of §772.101(1) Fla. Stat., the sources of Defendants' income included fee payments for the provision of the T-bills for the private

placement investment operations.  These fee payments were paid Defendants, but the T-bills were never provided to the private placement investors.

120.    In violation of §772.101(1) Fla. Stat., Defendants also developed additional income opportunities by circumventing confidentiality agreements with these investors and dealing directly with their contacts.

121.    In violation of §772.101(1) Fla. Stat., this income was then put back into Defendants' fraudulent investment operations which engage in interstate and foreign commerce.

122.    As a result of Defendants' misconduct, Manbaliq was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

### III – VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT; 3rd Claim

123.    Plaintiffs reallege paragraphs 1 through 108.

124.    This is a civil action by First Global under §772.101(1) Fla. Stat., against the Royal Bank Defendants, the Moore Stephens Defendants; and the Macari Defendants, and the European Defendants.

125.    In violation of §772.101(1) Fla. Stat., Defendants received income, directly and indirectly, from a pattern of racketeering activity which included

frauds and swindles against the private placement investors through the false representation of possessing and making T-bills available for investment purposes.

126.    In violation of §772.101(1) Fla. Stat., the sources of Defendants' income included fee payments for the provision of the T-bills for the private placement investment operations.  These fee payments were paid Defendants, but the T-bills were never provided to the private placement investors.

127.    In violation of §772.101(1) Fla. Stat., Defendants also developed additional income opportunities by circumventing confidentiality agreements with these investors and dealing directly with their contacts.

128.    In violation of §772.101(1) Fla. Stat., this income was then put back into Defendants' fraudulent investment operations which engage in interstate and foreign commerce.

129.    As a result of Defendants' misconduct, First Global was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## IV – VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT; 4th Claim

130.    Plaintiffs reallege paragraphs 1 through 108.

131.    This is a civil action under §772.101(2) Fla. Stat., by Jewel against the Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, and the Macari Defendants.

132.    In violation of §772.101(2) Fla. Stat., Defendants acquired and maintained interest in and control of their enterprise companies, which have all engaged in fraudulent racketeering activities.   These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on these false representations from victims including Jewel. They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

133.    As a result of Defendants' misconduct, Jewel was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## V–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 5th Claim

134.    Plaintiffs reallege paragraphs 1 through 108.

135.    This is a civil action under §772.101(2) Fla. Stat., by the Manbaliq Plaintiffs against the Royal Bank Defendants, the Moore Stephens Defendants, the Macari Defendants, and the Euro-Securities Defendants.

136.    In violation of §772.101(2) Fla. Stat., Defendants acquired and maintained interest in and control of their enterprise companies, which have all engaged in fraudulent racketeering activities.  These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including the Manbaliq Plaintiffs.  They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

137.    As a result of Defendants' misconduct, the Manbaliq Plaintiffs were damaged by Defendants' failure to comply with their financial obligations so that the Manbaliq Plaintiffs could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## VI–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 6th Claim

138.    Plaintiffs reallege paragraphs 1 through 108.

139.    This is a civil action under §772.101(2) Fla. Stat., by the First Global against the Royal Defendants, the Moore Stephens Defendants, the Macari Defendants, and the European Defendants.

140.    In violation of §772.101(2) Fla. Stat., Defendants acquired and maintained interest in and control of their enterprise companies, which have all engaged in fraudulent racketeering activities.  These activities include the false

representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including First Global. They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

141.    As a result of Defendants' misconduct, First Global was damaged by Defendants' failure to comply with their financial obligations so that First Global could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## VII–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 7th Claim

142.    Plaintiffs reallege paragraphs 1 through 108.

143.    This is a civil action by Jewel under §772.101(3) Fla. Stat., against the Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, and the Macari Defendants.

144.    In violation of §772.101(3) Fla. Stat., Defendants associated with and conspired with their enterprise companies, which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided them in their schemes. These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations

from victims including Jewel.  They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

145.    As a result of Defendants' misconduct, Jewel was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## VIII–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 8th Claim

146.    Plaintiffs reallege paragraphs 1 through 108.

147.    This is a civil action by the Manbaliq Plaintiffs under §772.101(3) Fla. Stat., against the Royal Bank Defendants, the Moore Stephens Defendants, the Euro-Securities Defendants, and the Macari Defendants.

148.    In violation of §772.101(3) Fla. Stat., Defendants associated with and conspired with their enterprise companies, which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided them in their schemes. These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including the Manbaliq Plaintiffs.  They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

149.    As a result of Defendants' misconduct, the Manbaliq Plaintiffs was damaged by Defendants' failure to comply with their financial obligations so that the Manbaliq Plaintiffs could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## XI–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 9th Claim

150.    Plaintiffs reallege paragraphs 1 through 108.

151.    This is a civil action by First Global under §772.101(3) Fla. Stat., against the Royal Bank Defendants, the Moore Stephens Defendants, the European Defendants, and the Macari Defendants.

152.    In violation of §772.101(3) Fla. Stat., Defendants associated with and conspired with their enterprise companies, which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided them in their schemes. These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including First Global.   They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

153.    In violation of §772.101(3) Fla. Stat., the European Defendants have been associated with the other Defendants and conspired with those Defendants to

engage in the same fraudulent racketeering activities as Macari. More specifically, the European Defendants swindled First Global into believing that they were honoring an agreement with them, while then circumventing that agreement and dealing directly with the other Defendants.

154. In addition, the European Defendants apparently were successful in dealing with the others, with great success, and kept all the revenue.

155. As a result of Defendants' misconduct, First Global was damaged by Defendants' failure to comply with their financial obligations so that First Global could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## X–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 10th Claim

156. Plaintiffs reallege paragraphs 1 through 108.

157. This is a civil action by Jewel under §772.101(4) Fla. Stat., against the Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, and the Macari Defendants.

158. In violation of §772.101(4) Fla. Stat., Defendants associated with and conspired with their enterprise companies which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided him in his schemes. These activities

include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including Jewel. They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

159.    As a result of Defendants' misconduct, Jewel was damaged by Defendants' failure to comply with their financial obligations so that Jewel could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## XI–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 11th Claim

160.    Plaintiffs reallege paragraphs 1 through 108.

161.    This is a civil action by the Manbaliq Plaintiffs under §772.101(4) Fla. Stat., against the Royal Bank Defendants, the Moore Stephens Defendants, the Euro-Securities Defendants, and the Macari Defendants.

162.    In violation of §772.101(4) Fla. Stat., Defendants associated with and conspired with their enterprise companies which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided him in his schemes. These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims

including the Manbaliq Plaintiffs. They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

163. As a result of Defendants' misconduct, the Manbaliq Plaintiffs were damaged by Defendants' failure to comply with their financial obligations so that the Manbaliq Plaintiffs could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## XII–VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT - 12th Claim

164. Plaintiffs reallege paragraphs 1 through 108.

165. This is a civil action by First Global under §772.101(4) Fla. Stat., against the Royal Bank Defendants, the Moore Stephens Defendants, the European Defendants, and the Macari Defendants.

166. In violation of §772.101(4) Fla. Stat., Defendants associated with and conspired with their enterprise companies which have all engaged in fraudulent racketeering activities. Defendants have also been associated with and conspired with external agents who have aided him in his schemes. These activities include the false representation that T-bills are available for private placement investing, and then collecting fees based on this false representations from victims including Jewel. They also include circumventing confidentiality trade secrets agreements to deal directly with investment contacts.

167.    In violation of §772.101(4) Fla. Stat., the European Defendants have been associated with the enterprise companies of the other Defendants and conspired with those Defendants to engage in the same fraudulent racketeering activities as Macari.  More specifically, the European Defendants swindled First Global into believing that they were honoring an agreement with them, while circumventing that agreement and dealing directly with Macari to provide him with the investor Allfina.

168.    As a result of Defendants' misconduct, First Global was damaged by Defendants' failure to comply with their financial obligations so that the First Global could earn the revenue available if the T-Bills promised by the Defendants had been assigned.

## XIII– FRAUD BY JEWEL AGAINST THE ROYAL BANK DEFENDANTS, THE BLOOMBERG DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS AND THE EUROPEAN DEFENDANTS

169.    Plaintiffs reallege paragraphs 1 through 108.

170.    Major's August 19, 2004 written representation for Royal Bank, *see* Exhibit "W",  to Jewel concerning the validity of Century's / B&T's claim to have full unencumbered legal title to existing T-bills was made within the course and scope of his authority as manager of Royal Bank's Nassau, Bahamas branch and Royal Bank is fully responsible for his actions.

171.    Taylor's written and oral representations to Jewel and his conduct concerning the Century / B&T actions concerning T-bills and to each of the other Plaintiffs were made or undertaken within the course and scope of Taylor's authority to act for the Moore Stephens Defendants; each of those Defendants is jointly and severally responsible to Jewel for Taylor's actions.

172.    Macari, Taylor, Gorman, and Clark also made written and oral representations and engaged in concerted conduct which constituted representation to Jewel that Century / B&T had full right, title, and interest in a number of United States treasury bills and could and would deal with those T-bills honestly and pursuant to their written promises, representations, and actions; Century, B&T and the other relevant Defendants are each therefore fully responsible for their statements and actions.

173.    Macari has employed and used Foxmor, Jamar, and Summit as his *alter egos* or as Century's mere instrumentality to receive monies and to hold them for Macari and Century, and those entities should also be held liable for Macari's misconduct and required to return and hand over all moneys received during the events set forth in this pleading.

174.    Defendants are jointly and severally liable for fraud.

175.   Beginning in the 1990's, assisted by Major, Royal Bank, Gorman, and later by Clark, Macari and Taylor commenced a course of conduct of fraud, and devised and executed a scheme and artifice to defraud and to swindle others, by a similar and ongoing pattern of telephone and mail and wire fraud, whereby those Defendants:

(a)   held themselves out as owning and controlling over twenty large denomination T-bills.[10]

(b)   located and attracted persons and entities with the ability, experience, and business associations and contacts who could serve as brokers, finders, intermediaries, procuring causes, or some or all of these, of lucrative investments through financial arrangements with substantial western European banking institutions;

(c)   entered upon contractual arrangements with such persons or entities, promising to make the T-bills available for use as collateral for such investments, and promising in each instance both not to attempt to deal directly with the contracting parties' sources and associates, but also to maintain the confidentiality of all Plaintiff's information;

---

[10] *See* Exhibit "X" which is annexed and made part of the pleading.

(d)  thereafter, having obtained such information, disavowed the contracts, used the device of spurious "cease and desist" letters, and otherwise breached the contracts;

(e)  kept and used their contracting parties' information and businesses sources and deliberately violated their obligations not to deal directly with such sources and contracts, and not to use confidential information;

(f)  generally misappropriated Jewel's trade secrets (and in the course of those misappropriations violated the Economic Espionage Act of 1996) by deliberately or negligently causing such trade secrets to be placed into the hands of foreign interests.

176.    Jewel is merely among the most recent victims of those Defendants' schemes and artifices to defraud and misappropriation of trade secrets; previously and subsequently those Defendants had worked such schemes upon each of the other Plaintiffs and upon others.

177.    In each instance, acting for or with the other Defendants, the named Defendants:

(a)     made false statements of material facts;

(b)     which they knew to be false, did not know to be true, or should have known to be false;

(c)     intended for each Plaintiff to rely upon them;

(d)     caused each Plaintiff to rely upon them; and thereby,

(e)     caused significant damages to each Plaintiff, depriving each of expected profits, and depriving each of confidential and proprietary information and trade secrets.

178.   In each instance the named Defendants, acting for or with the other Defendants, made oral and written contractual and other promises without a then-present intention or ability to honor those contracts or promises.

179.   In lay terms, Defendants were and are a ring of defrauders and swindlers, preying upon legitimate business people and businesses; Defendants were and are and an organized group intending to and systematically violating the Economic Espionage Act of 1996, and the Uniform Trade Secrets Act, among others.

180.   As a result of Defendants' actions, all Plaintiffs suffered substantial damages for which all Defendants are jointly and severally liable.

181.  Defendants' conduct was and remains deliberate and willful.

182.   Were such conduct allowed to go unrebuked and unpunished Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

183.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XIV - FRAUD BY MANBALIQ AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS AND THE EURO-SECURITIES DEFENDANTS

184.    The Manbaliq Plaintiffs reallege paragraphs 1 through 108.

185.    Major's August 19, 2004 written representation for Royal Bank, *see* Exhibit "W", to the Manbaliq Plaintiffs concerning the validity of Century's / B&T's claim to have full unencumbered legal title to existing T-bills was made within the course and scope of his authority as manager of Royal Bank's Nassau, Bahamas branch and Royal Bank is fully responsible for his actions.

186.    Taylor's written and oral representations to the Manbaliq Plaintiffs and his conduct concerning the Century / B&T actions concerning T-bills were made or undertaken within the course and scope of Taylor's authority to act for the Moore Stephens Defendants; each of those Defendants is jointly and severally responsible to the Manbaliq Plaintiffs.

187.    The Macari Defendants also made written and oral representations and engaged in concerted conduct which constituted representation to the

Manbaliq Plaintiffs that Century / B&T had full right, title, and interest in a number of United States treasury bills and could and would deal with those T-bills honestly and pursuant to their written promises, representations, and actions; Century, B&T and the other relevant Defendants are each therefore fully responsible for their statements and actions.

188. Macari has employed and used Foxmor, Jamar, and Summit as his *alter egos* or as Century's mere instrumentality to receive monies and to hold them for Macari and Century, and those entities should also be held liable for Macari's misconduct and required to return and hand over all moneys received during the events set forth in this pleading.

189. Defendants are jointly and severally liable for fraud.

190. Beginning in the 1990's, assisted by Major, Royal Bank, Gorman, and later by Clark, Macari, and Taylor commenced a course of conduct of fraud, and devised and executed a scheme and artifice to defraud and to swindle others, by a similar and ongoing pattern of telephone and mail and wire fraud, whereby those Defendants:

(a)      held themselves out as owning and controlling over twenty large denomination T-bills.[11]

---

[11] *See* Exhibit "X".

(b)     located and attracted persons and entities with the ability, experience, and business associations and contacts who could serve as brokers, finders, intermediaries, procuring causes, or some or all of these, of lucrative investments through financial arrangements with substantial western European banking institutions;

(c)     entered upon contractual arrangements with such persons or entities, promising to make the T-bills available for use as collateral for such  investments, and promising in each instance both not to attempt to deal directly with the contracting parties' sources and associates, but also to maintain the confidentiality of all Plaintiff's information;

**(d)**     thereafter, having obtained such information, disavowed the contracts, used the device of spurious "cease and desist" letters, and otherwise breached the contracts;

(e)     kept and used their contracting parties' information and businesses sources and deliberately violated their obligations not to deal directly with such sources and contracts, and not to use confidential information;

(f)     generally misappropriated Plaintiffs' and others' trade secrets (and in the course of those misappropriations violated the Economic Espionage Act of

1996) by deliberately or negligently causing such trade secrets to be placed into the hands of foreign interests.

191.    The Manbaliq Plaintiffs are merely among the most recent victims of those Defendants' schemes and artifices to defraud and misappropriation of trade secrets; previously and subsequently those Defendants had worked such schemes upon each of the other Plaintiffs and upon others.

192.    In each instance, acting for or with the other Defendants, the named Defendants:

(a)      made false statements of material facts;

(b)      which they knew to be false, did not know to be true, or should have known to be false;

(c)      intended for each Plaintiff to rely upon them;

(d)      caused each Plaintiff to rely upon them; and thereby,

(e)      caused significant damages to each Plaintiff, depriving each of expected profits, and depriving each of confidential and proprietary information and trade secrets.

193.    In each instance the named Defendants, acting for or with the other Defendants, made oral and written contractual and other promises without a then-present intention or ability to honor those contracts or promises.

194.    In lay terms, Defendants were and are a ring of defrauders and swindlers, preying upon legitimate business people and businesses; Defendants were and are and an organized group intending to and systematically violating the Economic Espionage Act of 1996, and the Uniform Trade Secrets Act, among others.

195.    As a result of Defendants' actions, all Plaintiffs suffered substantial damages for which all Defendants are jointly and severally liable.

196.    Defendants' conduct was and remains deliberate and willful.

197.    Were such conduct allowed to go unrebuked and unpunished Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

198.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a plaintiff automatically has the right to have a jury consider punitive damages).]

## XV – FRAUD BY FIRST GLOBAL AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS AND THE EUROPEAN DEFENDANTS

199.    First Global realleges paragraphs 1 through 108 and 110 to 198.

200.    Major's August 19, 2004 written representation for Royal Bank, *see* Exhibit "W", to First Global concerning the validity of Century's / B&T's claim to have full unencumbered legal title to existing T-bills was made within the course and scope of his authority as manager of Royal Bank's Nassau, Bahamas branch and Royal Bank is fully responsible for his actions.

201.    Taylor's written and oral representations to First Global and his conduct concerning the Century / B&T actions concerning T-bills were made or undertaken within the course and scope of Taylor's authority to act for the Moore Stephens Defendants; each of those Defendants is jointly and severally responsible to First Global and to each Plaintiff for Taylor's actions.

202.    Macari, Taylor, Gorman, and Clark also made written and oral representations and engaged in concerted conduct which constituted representation to First Global that Century / B&T had full right, title, and interest in a number of United States treasury bills and could and would deal with those T-bills honestly and pursuant to their written promises, representations, and actions; Century, B&T and the other relevant Defendants are each therefore fully responsible for their statements and actions.

203.    Macari has employed and used Foxmor, Jamar, and Summit as his *alter egos* or as Century's mere instrumentality to receive monies and to hold them

for Macari and Century, and those entities should also be held liable for Macari's misconduct and required to return and hand over all moneys received during the events set forth in this pleading.

204.    Defendants are jointly and severally liable for fraud.

205.    Beginning in the 1990's, assisted by Major, Royal Bank, Gorman, and later by Clark, Macari and Taylor commenced a course of conduct of fraud, and devised and executed a scheme and artifice to defraud and to swindle others, by a similar and ongoing pattern of telephone and mail and wire fraud, whereby those Defendants:

(a)    held themselves out as owning and controlling over twenty large denomination T-bills.[12]

(b)    located and attracted persons and entities with the ability, experience, and business associations and contacts who could serve as brokers, finders, intermediaries, procuring causes, or some or all of these, of lucrative investments through financial arrangements with substantial western European banking institutions;

(c)    entered upon contractual arrangements with such persons or entities, promising to make the T-bills available for use as collateral for such  investments,

---

[12] *See* Exhibit "X"

and promising in each instance both not to attempt to deal directly with the contracting parties' sources and associates, but also to maintain the confidentiality of all Plaintiff's information;

    (d)      thereafter, having obtained such information, disavowed the contracts, used the device of spurious "cease and desist" letters, and otherwise breached the contracts;

    (e)      kept and used their contracting parties' information and businesses sources and deliberately violated their obligations not to deal directly with such sources and contracts, and not to use confidential information;

    (f)      generally misappropriated First Global's trade secrets (and in the course of those misappropriations violated the Economic Espionage Act of 1996) by deliberately or negligently causing such trade secrets to be placed into the hands of foreign interests.

    206.   First Global is merely among the most recent victims of those Defendants' schemes and artifices to defraud and misappropriation of trade secrets; previously and subsequently those Defendants had worked such schemes upon each of the other Plaintiffs and upon others.

    207.   In each instance, acting for or with the other Defendants, the named Defendants:

(a)      made false statements of material facts;

(b)      which they knew to be false, did not know to be true, or should have known to be false;

(c)      intended for First Global to rely upon them;

(d)      caused First Global to rely upon them; and thereby,

(e)      caused significant damages to each Plaintiff, depriving each of expected profits, and depriving each of confidential and proprietary information and trade secrets.

208.    In each instance the named Defendants, acting for or with the other Defendants, made oral and written contractual and other promises without a then-present intention or ability to honor those contracts or promises.

209.    In lay terms, Defendants were and are a ring of defrauders and swindlers, preying upon legitimate business people and businesses; Defendants were and are and an organized group intending to and systematically violating the Economic Espionage Act of 1996, and the Uniform Trade Secrets Act, among others.

210.    As a result of Defendants' actions, First Global suffered substantial damages for which all Defendants are jointly and severally liable.

211.    Defendants' conduct was and remains deliberate and willful.

212.    Were such conduct allowed to go unrebuked and unpunished, Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

213.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a plaintiff automatically has the right to have a jury consider punitive damages).]

## XVI – CONSPIRACY TO DEFRAUD BY JEWEL AGAINST THE ROYAL BANK DEFENDANTS, THE BLOOMBERG DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, AND THE MACARI DEFENDANTS

214.    Jewel realleges paragraphs 1 through 108 and 110 to 198.

215.    The Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, and the Macari Defendants, or some of them, conspired with one another to defraud Jewel, or aided and abetted the conspiracy, or both.

216.    As a result of Defendants' actions, Jewel suffered substantial damages for which all Defendants are jointly and severally liable.

217.    These Defendants are therefore jointly and severally liable to Jewel for the compensatory damages suffered.

218.    Were such conduct allowed to go unrebuked and unpunished these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

219.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XVII– CONSPIRACY TO DEFRAUD BY THE MANBALIQ PLAINTIFFS AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EURO-SECURITIES DEFENDANTS

220.    The Manbaliq Plaintiffs reallege paragraphs 1 through 108, and 110 through 198.

221.    The Royal Bank Defendants, Moore Stephens Defendants, Euro-Securities Defendants, and Macari Defendants, or some of them, conspired with one another to defraud the Manbaliq Plaintiffs, or aided and abetted the conspiracy, or both.

222.    As a result of Defendants' actions, the Manbaliq Plaintiffs suffered substantial damages for which all Defendants are jointly and severally liable.

223.    These Defendants are therefore jointly and severally liable to the Manbaliq Plaintiffs for the compensatory damages suffered by each.

224.   Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

225.   [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XVIII – CONSPIRACY TO DEFRAUD BY FIRST GLOBAL AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EUROPEAN DEFENDANTS

226.   First Global realleges paragraphs 1 through 108, and 110 through 198.

227.   The Royal Bank Defendants, the Moore Stephens Defendants, the European defendants, and the Macari Defendants conspired with one another to defraud Plaintiff First Global, or aided and abetted the conspiracy, or both.

228.   As a result of Defendants' actions, First Global suffered substantial damages for which all Defendants are jointly and severally liable.

229.   These Defendants are therefore jointly and severally liable to Plaintiff First Global for the compensatory damages suffered.

230.   Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

231.   [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a plaintiff automatically has the right to have a jury consider punitive damages).]

## XIX – MISAPPROPRIATION OF TRADE SECRETS BY JEWEL AGAINST THE ROYAL BANK DEFENDANTS, THE BLOOMBERG DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS AND THE EUROPEAN DEFENDANTS

232.   Jewel realleges paragraphs 1 through 108, and 110 through 198.

233.   By the foregoing misconduct, the Royal Bank Defendants, Bloomberg Defendants, the Moore Stephens Defendants, the Macari Defendants and the European Defendants also misappropriated Jewel's trade secrets and their confidential, proprietary information.

234.   As a result, Jewel has been substantially damaged.

235.   These Defendants are jointly and severally liable to Jewel.

236.   Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

237.  [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XX – MISAPPROPRIATION OF TRADE SECRETS BY THE MANBALIQ PLAINTIFFS AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EURO-SECURITIES DEFENDANTS

238.  The Manbaliq Plaintiffs reallege paragraphs 1 through 108, and 110 through 198.

239.  By the foregoing misconduct, the Royal Bank Defendants, the Moore Stephens Defendants, the Macari Defendants and the Euro-Securities Defendants also misappropriated the Manbaliq Plaintiffs' trade secrets and their confidential, proprietary information.

240.  As a result, the Manbaliq Plaintiffs have been substantially damaged.

241.  These Defendants are jointly and severally liable to the Manbaliq Plaintiffs.

242.  Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

243.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XXI – MISAPPROPRIATION OF TRADE SECRETS BY FIRST GLOBAL AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EUROPEAN DEFENDANTS

244.    First Global realleges paragraphs 1 through 108, and 110 through 198.

245.    By the foregoing misconduct, the Royal Bank Defendants, the Moore Stephens Defendants, the Macari Defendants, and the European Defendants also misappropriated First Global's trade secrets and its confidential, proprietary information.

246.    As a result, First Global has been substantially damaged.

247.    These Defendants are jointly and severally liable to First Global.

248.    Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

249.   Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

250.   [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, a Plaintiff automatically has the right to have a jury consider punitive damages).]

## XXII- CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS BY JEWEL AGAINST THE ROYAL BANK DEFENDANTS, THE BLOOMBERG DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS AND THE EUROPEAN DEFENDANTS

251.   Jewel realleges paragraphs 1 through 108, and 110 to 198.

252.   The Royal Bank Defendants, the Bloomberg Defendants, the Moore Stephens Defendants, the Macari Defendants, and the European Defendants conspired with one another to steal Jewel's trade secrets and confidential proprietary information, or aided and abetted the conspiracy, or both.

253.   As a result, Jewel has been substantially damaged.

254.   These Defendants are therefore jointly and severally liable to Jewel for compensatory damages.

255.    Allowing such conduct to go unrebuked and unpunished would encourage these Defendants to continue and to repeat it, and would encourage others to engage in such truly egregious conduct.

256.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, Plaintiff has the right automatically to have the jury consider punitive damages).]

### XXIII- CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS BY THE MANBALIQ PLAINTIFFS AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EURO-SECURITIES DEFENDANTS

257.    The Manbaliq Plaintiffs reallege paragraphs 1 through 108, and 110 to 198.

258.    The Royal Bank Defendants, the Moore Stephens Defendants, the Macari Defendants, and the Euro Securities Defendants conspired with one another to steal the Manbaliq Plaintiffs' trade secrets and confidential proprietary information, or aided and abetted the conspiracy, or both.

259.    These Defendants are therefore jointly and severally liable to the Manbaliq Plaintiffs for compensatory damages.

260.    Allowing such conduct to go unrebuked and unpunished would encourage these Defendants to continue and to repeat it, and would encourage others to engage in such truly egregious conduct.

261.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, Plaintiff has the right automatically to have the jury consider punitive damages).]

## XXIV - CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS BY FIRST GLOBAL AGAINST THE ROYAL BANK DEFENDANTS, THE MOORE STEPHENS DEFENDANTS, THE MACARI DEFENDANTS, AND THE EUROPEAN DEFENDANTS

262.    First Global realleges paragraphs 1 through 108, and 110 to 198.

263.    The Royal Bank Defendants, the Moore Stephens Defendants, and the Macari Defendants, and the European Defendants conspired with one another to steal First Global's trade secrets and confidential proprietary information, or aided and abetted the conspiracy, or both.

264.    As a result of Defendants' actions, First Global suffered substantial damages for which all Defendants are jointly and severally liable.

265.    These Defendants are therefore jointly and severally liable to First Global for compensatory damages.

266.    Allowing such conduct to go unrebuked and unpunished would encourage these Defendants to continue and to repeat it, and would encourage others to engage in such truly egregious conduct.

267.    The particular Bloomberg screen used to defraud Jewel, *See* Exhibits "G" and "H".  The Shilton/Hudson Management version of the *same account* is annexed and made part of this pleading as Exhibit "M".  Comparison of the two reveals that Bloomberg apparently provides no protection whatsoever against blatant misuse of its screens: Exhibits "G" and "H" are quite plainly the same screen/ account number as Exhibit "M", with certain words wholly or partly changed.  For example, both are "I.D. #UT912" but that one is "UT912BX6" and the other is "UB9127W81" but both are "firm #71398 / user #231339" and the other is "firm #71398/ user # ******".  One uses "Tilton", another uses "Shilton".

## XXV – NEGLIGENT MISREPRESENTATION BY PLAINTIFFS AGAINST THE ROYAL BANK DEFENDANTS, THE BLOOMBERG DEFENDANTS AND THE MOORE STEPHENS DEFENDANTS

268.    Plaintiffs re-allege paragraphs 1 through 108 and 110 to 198, inclusively.

269.    In its course of their business, profession, or employment, and/or in the transactions in which they had a pecuniary interest, Defendants Royal Bank, Bloomberg and Moore Stephens supplied false information to Plaintiffs.

270.   The Royal Bank Defendants, the Bloomberg Defendants and the Moore Stephens Defendants failed to exercise reasonable care or competence in allowing their screens, information, and data to be easily manipulated by Defendants so that they would mislead Plaintiffs into believing that the T-bills were assigned to Jewel and that they were holding the T-bills in escrow for Jewel.

271.   The information provided to Plaintiffs by these Defendants was false.

272.   These Defendants knew that the information was false, should have known that it was false, or represented it to be true without knowing it to be true.

273.   These Defendants did not take appropriate steps either to investigate and/or to understand all relevant facts and information concerning their clients and branches, or did not implement reasonable due diligence requirements or take reasonable steps to implement security measures to protect the screens, information and data.

274.   The Bloomberg Defendants therefore should have protected its financial data and its financial network to prevent damage to Plaintiffs.

275.   The Bloomberg Defendants specifically were paid for, and specifically intended that their information, financial data, assurances, and advice to Plaintiffs would benefit Plaintiffs and intended them to rely upon it.

276. Plaintiffs justifiably, foreseeably, and reasonably relied on Defendants' representations concerning their assurances and the validity of the financial information and other data provided by Defendants to induce Plaintiffs to rely upon it.

277. Plaintiffs justifiably, foreseeably, and reasonably relied on Defendants Royal Bank's, Bloomberg's and Moore Stephens' representations when, with Defendants' encouragement, Plaintiffs paid moneys for the right to possess title and interest in the T-bills.

278. As a result of these Defendants misrepresentations, and of Plaintiffs' justified reliance on that false information, Plaintiffs have been and continue to be injured in their business and property. Additionally, Plaintiffs have been injured in their reputation in the financial community.

## XXVI-GROSS NEGLIGENCE BY PLAINTIFFS AGAINST THE BLOOMBERG DEFENDANTS

279. Plaintiffs reallege paragraphs 1 through 108, and 110 to 198.

280. Plaintiffs relied on the statements by the Bloomberg Defendants that their financial reports are a source of reliable, dependable financial data, which it provides through its financial information network.

281. Bloomberg is guilty of gross negligence and willful and wanton misconduct in hiring and supervising its associates, and grossly negligent in failing

to monitor and to prevent repeated misuse of Bloomberg security screens for the perpetration of a series of scams, frauds, and swindles over many years by Heller, Botosan, Shilton, Hudson Management, and others yet undiscovered.

282.     Alternatively, Bloomberg, through its agents Heller and Botosan, was consciously, deliberatively, and actively aiding and abetting a scam or series of scams, frauds, and swindles over the years by the other Bloomberg Defendants.

283.     The stated misuse of Bloomberg screens was unknown and, by the exercise of ordinary care, unknowable by Plaintiffs.

284.     By April, 2005, all that appeared to be necessary for Jewel to complete Century's / B&T's obligations for Jewel to use the T-bills in the private placement activities, was for Royal Bank (or, assuming that Defendants misrepresented that Royal Bank was the supposed bank with book entries, whichever bank has book-entry-system computer ledgers which could show or negate Century/B&T's ownership of and clear title to the T-bills) was for Jewel to confirm that B&T's December 6, 2004 assignments to Jewel were valid.   That would have eliminated any doubt Jewel possessed full right, title, and interest in the T-bills, free and clear of all encumbrances.

285.     As a direct result of the Defendants' scheme, Plaintiffs have been and continue to be injured in their business and property. Defendants have

fraudulently retained money due Plaintiffs and have caused Plaintiffs to incur substantial business and administrative expense. Additionally, Plaintiffs have been injured in their reputation in the financial community.

286.    Were such conduct allowed to go unrebuked and unpunished, these Defendants would be encouraged to continue and to repeat it; that would also encourage others to engage in such egregious conduct.

287.    [Reserved for amendment to seek punitive damages if permitted by the Court. *But see First Interstate Dev. Corp. vs Ablanedo 511 So.2d 536* (Fla. 1987) (where intentional fraud issue is tried, Plaintiff has the right automatically to have the jury consider punitive damages).]

Wherefore, Plaintiffs pray for the following relief:

(a) compensatory, actual, consequential, treble, and other relief damages under the Florida Act;

(b) compensatory actual, consequential, treble, and other relief damages arising from breach of each Plaintiffs' contracts with Century and with B&T, including, without limitation, Plaintiffs' lost prospective (and projected) profits and returns on the contracts which Century's agreements would have permitted Plaintiffs to enter;

(c) damages arising from Defendants' fraud and misappropriation of trade secrets, from their conspiring to defraud, and for their conspiring to misappropriate trade secrets;

(d) damages arising from Defendants' negligence, gross negligence, or both;

[(e) punitive damages, if permitted by the Court];

(f) equitable relief, including revocation of charters and licenses, and consideration of all remedies and powers according to the Court under the Florida Acts; and

(g) such other and further legal and equitable relief as may be meet and proper under all the circumstances.

Bailey & Dawes, LC
Counsel for Plaintiffs
Continental Plaza, Suite 100
3250 Mary Street
Coconut Grove, FL 33133

By: _____
Guy B. Bailey, Jr
Fla. Bar No. 96095
Tel. (305) 374-5505
Fax (305) 374-6715

*Jewel Finance vs Royal Bank of Canada, et. al*

**Page 75 of 77**

## APPENDIX
## TO THE SECOND AMENDED COMPLAINT FOR FLORIDA ACT VIOLATIONS, FRAUD, CONSPIRACY TO DEFRAUD, AND BREACH OF CONTRACT AND GROSS NEGLIGENCE

APPENDIX

## Exhibit

**A¹.** Moore Stephens web site; Careers

**A².** Moore Stephens web site; Membership

**A.** Moore Stephens web site; About it

**B.** "Prospectus"-Century $2,841,900,000 USD

**C.** "Operating Agreement" between Century Capital, S.A. and Jewel Finance Netherlands BV

**D.** "Non-Circumvention, Non-Disclosure and Confidentiality Agreement" between Century Capital, S.A. and Jewel Finance Netherlands

**E.** "Extension Agreement" between Century Capital, B&T Corporate Mgrs Ltd and Jewel Finance

**F.** Exhibits to the Extension Agreement: "Operating Agreement," correlative Century "Promissory Notes," "Security Agreements," "Collateral Deeds of Assignments" and "Assignments of Interest."

**G.** Photocopies of Century's / B&T's T-bills on the Bloomberg security display.

**H.** Photocopies of Century's / B&T's T-bills on the Bloomberg security display.